# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BYRON L. PICKARD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 06-1039 (JR) |
| v. | ) | |
| | ) | |
| NATIONAL TRANSPORTATION | ) | |
| SAFETY BOARD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant National

Transportation Safety Board ("NTSB"), respectfully moves for judgment as a matter of law.  In

support of this motion, defendant respectfully refers the Court to the attached memorandum of

points and authorities, statement of material facts not in genuine dispute, and the declarations of

the defendant.

September 14, 2006                    Respectfully submitted,


_____/s/_____
KENNETH L. WAINSTEIN, D.C.  BAR# 451058
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-1249
(202) 514-8780 (facsimile)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BYRON L. PICKARD, | ) | |
| | ) | |
| Plaintiff, | ) | No. 06-1039 (JR) |
| v. | ) | |
| | ) | |
| NATIONAL TRANSPORTATION | ) | |
| SAFETY BOARD, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Defendant, National Transportation Safety Board ("NTSB"), respectfully submits this statement of material facts as to which there are no genuine disputes in accordance with this Court's Local Rule 7(h).

## The NTSB

1.  The NTSB is an independent Federal agency charged by Congress with investigating every civil aviation accident in the United States and significant accidents in the other modes of transportation -- railroad, highway, marine and pipeline -- and issuing safety recommendations aimed at preventing future accidents. The NTSB derives its authority from Congress. See 49 U.S.C. § 1101-1155. The NTSB determines the probable cause of:

- all U.S. civil aviation accidents and certain public-use aircraft accidents;
- selected highway accidents;
- railroad accidents involving passenger trains or any train accident that results in at least one fatality or major property damage;
- major marine accidents and any marine accident involving a public and a nonpublic vessel;
- pipeline accidents involving a fatality or substantial property damage;
- releases of hazardous materials in all forms of transportation; and

1

- selected transportation accidents that involve problems of a recurring nature.

In accordance with the NTSB's role in investigating accidents, the NTSB is authorized to bring a civil actions in Federal Court to enforce certain statutory provisions, or regulations prescribed or orders issued under any of those sections, and to request that the Attorney General file civil action on its behalf.  See 49 U.S.C. § 1151.

2.  With less than 90 employees available to investigate all civil aviation accidents in the United States, the NTSB accomplishes its task of accident investigation by leveraging its resources.  Declaration of Tom Haueter ¶ 6 ("Haueter Decl.").  The main way in which the NTSB utilizes its limited resources most effectively and thoroughly is by designating *parties* to its investigations that possess pertinent technical data required to understand the nature of the accident.  Haueter Decl. ¶ 6.  For example, the NTSB often designates aircraft manufacturers, operators, owners, trade unions, and any person or entity that can provide necessary information as parties to an investigation.  Haueter Decl. ¶ 6.  Other than the Federal Aviation Administration (FAA), which, under 49 U.S.C. § 1132(c), the NTSB automatically designates as a party to each aviation investigation that the NTSB conducts, the NTSB has complete discretion over which organizations it designates as parties to each investigation.  Haueter Decl. ¶ 6.  The NTSB only considers organizations or corporations that can provide necessary expertise to an investigation as parties to the investigation.  Haueter Decl. ¶ 6.  All party members report directly to the NTSB, and each party coordinator signs a party agreement stating that they, their company, or their organization will comply with the NTSB's governing regulations regarding party participation, available at 49 C.F.R. pt. 831.  Haueter Decl. ¶ 6.

2

3.  Given the small size of the NTSB, it is impossible for the NTSB to have expert knowledge of every type of airplane, helicopter, engine, or component; therefore, the NTSB must rely on the voluntary cooperation of parties in providing expert technical and specialized information.  Haueter Decl. ¶ 7.  The gathering of this information is crucial so that NTSB investigators can utilize the data and information that parties provide in order to analyze the potential cause of each accident.  Haueter Decl. ¶ 7.  Without the cooperation of such parties in freely providing this information, the NTSB would be unable to fulfill its statutory directive, which is to investigate accidents, determine their likely causes, and issue safety recommendations to prevent future accidents.  Haueter Decl. ¶ 7.

4.  If the NTSB could not use this party system, or if parties to each investigation did not assist in investigations by providing data and information in an uninhibited manner, then the NTSB almost certainly would not be able to fulfill its statutory mission, which is improving safety by determining the cause of significant transportation accidents.  Haueter Decl. ¶ 8.

5.  In all major NTSB investigations, the NTSB forms groups to examine different aspects of each accident.  Haueter Decl. ¶ 9.  An Investigator-In-Charge ("IIC") oversees each group, in which members from the parties offer their specific expertise.  Haueter Decl. ¶ 9.  Groups that an IIC may organize include a human factors group, a meteorological group, a survival factors group, a witnesses group, and the like.  Haueter Decl. ¶ 9.

6.  An NTSB employee serves as the group chairperson for each investigative group.  Haueter Decl. ¶ 10.  With the help of group members, these chairpersons prepare a factual report, and subsequently ask each party in the group to verify the accuracy of the report.  Haueter Decl. ¶ 10.  The group chairpersons give these factual reports to the IIC, who places them in the

3

"public docket" of information for the investigation. Haueter Decl. ¶ 10. In general, the public docket is available upon the conclusion of each investigation, and contains all factual investigative information that was pertinent to the investigation. Haueter Decl. ¶ 10.

7. With regard to investigations of accidents that occur in foreign states, the NTSB does not act as the lead investigative authority. Instead, the NTSB may assist the investigating country by allowing an NTSB investigator to serve as the designated United States Accredited Representative. In this regard, the NTSB complies with Annex 13 of the Convention on International Civil Aviation, which provides:

> The State of Occurrence shall institute an investigation into the circumstances of the accident and be responsible for the conduct of the investigation, but it may delegate the whole or any part of the conducting of such investigation to another State by mutual agreement and consent.

Aircraft Accident and Incident Investigation, Annex 13 to the Convention on International Civil Aviation, at ¶ 5.1 (9th ed. 2001). See also Declaration of Melba Moye ¶ 13 (Moye Decl.").

8. Annex 13 of the Convention on International Civil Aviation also allows certain other foreign states to participate in the investigation:

> The State of Registry, the State of the Operator, the State of Design and the State of Manufacture shall each be entitled to appoint an accredited representative to participate in the investigation.

Id. at ¶ 5.14. In addition, Annex 13 allows accredited representatives to designate and supervise a team of advisors, in the interest of providing necessary expertise to accredited representatives. Id. at ¶ 5.24.1.

9. With regard to accident investigations and accident investigation related material, the NTSB primarily maintains four sets of agency records, which are:

4

a.  NTSB "Public Dockets":  The primary records of accident investigations conducted by the NTSB are found within the "public dockets" of the NTSB. The public docket of an accident contains the Safety Board staff's factual reports and related supporting material, which document the NTSB's investigative efforts pertaining to a particular accident.  The NTSB maintains an electronic index that lists the public dockets of investigations previously conducted by the NTSB.  This index may be searched by accident date, location of the accident and an accident specific, unique number.

b.  Accident Briefs/Summaries:  In order to identify particular aviation accidents investigated by the NTSB, certain summary information is maintained in a computerized aviation accident database, which may be searched by particular topics or categories of information and by individual words and terms within those topics or categories.  The topics and categories that may be searched via computer in order to identify particular accidents investigated by the NTSB include:  Date of Accident (a specific date of the accident or a date range), Location of Accident (including city and state within the United States and foreign country), Accident Aircraft Category (such as helicopter, airplane, blimp); Accident Aircraft Make (such as Cessna, Piper), Accident Aircraft Model, Aircraft Registration, Type of Operation (such as commercial or general aviation [non-commercial]), Accident Airline Name (if applicable), and NTSB Accident Number.  This database may be accessed by the public through the NTSB's web site at **www.ntsb.gov**.  At the home page, select "Aviation," followed by the first highlighted bullet on the Aviation page, which is "Accident Synopses."  Select either the Database Query form or the Monthly lists.  Complete all information that is known when using the query form, or select the appropriate month and date using the monthly lists option.  Then click "Submit Query", and the accident summary will be offered, or a table listing the investigations satisfying the criteria entered.  From the table, select the highlighted "Final" or "Primimary" or "Factual" in the far left column to connect to the report.

c.  NTSB Accident Investigation Files:  In certain instances, at the conclusion of the investigation of an aviation accident, paper and/or electronic copies of documents collected during the investigation are maintained by the NTSB in an investigative file.  The documents contained in these accident investigation files, while pertaining to a particular investigation, are not included in the public docket of an investigation.  These investigative files also do not contain reports of the NTSB that are otherwise made available to the public under NTSB rules.  In general, these investigation files often contain information that is not pertinent or even helpful to the NTSB's determination of probable cause for the investigation; for example, investigation files may contain drafts of items that are located in the public

5

docket, or photographs that are essentially duplicative of photographs in the public docket.

d.  Safety Recommendation Files:  The NTSB, in conjunction with its determination  of the probable cause of the accidents, develops recommendations intended to address perceived safety issues.  These recommendations are contained in a database.  The database is organized by the date of the accident, location of the accident (including city and state if in the United States, or foreign country, as appropriate), and type of aircraft involved and airline involved (if appropriate).

See  Moye Decl. ¶ 10.

10.  The NTSB's general records retention policy requires investigators and other employees who participate in an investigation to retain the records that are pertinent to the investigation for one year after the NTSB makes its probable cause determination regarding the investigation.  In general, when the NTSB makes this probable cause determination, the NTSB publishes those records in the NTSB Docket Management System (DMS).  Moye Decl. ¶ 12. DMS maintains all records pertinent to investigations since 1995 in electronic format.  Moye Decl. ¶ 12.  The purpose of this policy is to ensure that the NTSB will not lose records pertinent to investigations in the event that a network, computer, or other technological problem occurs and precludes the use of DMS.  Moye Decl. ¶ 12.  Given that all records pertinent to an investigation in which the NTSB served as the lead investigative authority are publicly available in the public docket for each accident, neither the applicable National Archives and Records Administration regulations, 36 C.F.R. pts. 1220-1238, nor the Federal Records Act, 44 U.S.C. §§ 2901-2910, 3101-3107, 3301-3324, require the NTSB to keep the additional records in working investigation files.  Moye Decl. ¶ 12.  As a general rule, regarding records that were not directly pertinent to an investigation, and are therefore not located in DMS, investigators maintain these extraneous records in the current year's working files, and then destroy them.  Moye Decl. ¶ 12.

6

**Plaintiff's April 26, 2006 FOIA Request and the NTSB's Response**

11.   On April 26, 2006, the law firm of Thelen, Reid & Priest LLP, though Byron L. Pickard, Esq., filed a FOIA request with the NTSB for use in its business.   See Exhibit A to plaintiff's complaint.   Plaintiff's FOIA request sought "a copy of all records or information and tangible things, whether made previously public or not related to the following helicopter accidents:" (1) NTSB Id. No. IAD00WA069, (2) NTSB Id. No. WAS01WA015, (3) NTSB Id. No. IAD00WA029, (4) NTSB Id. No. DCA97WA068, (5) NTSB Id. No. DCA98WA014, (6) NTSB Id. No. FTW01LA176, (7) NTSB Id. No. NYC86MA148, and (8) NTSB Id. No. DFW05MA230.   Id.

12.   Upon receiving plaintiff's request, the NTSB FOIA office assigned it to Track Three and planned to respond to the request in turn in the numbered sequence of FOIA requests within Track Three, which includes "complex request," i.e., requests that involve voluminous records and for which lengthy or numerous consultations are required, or those requests with may involve sensitive records.   See Moye Decl. ¶¶ 7-10.

13.   When the NTSB FOIA Office receives a request for records from a specific investigation, the FOIA Office provides a copy of the request to the Investigator-In-Charge ("IIC") (or, where the investigation occurred under the supervision of a foreign state, the United States accredited representative at the NTSB), and asks that person to send all records within the scope of the request to the FOIA Office.   Moye Decl. ¶ 20.   The FOIA Office also reminds the IIC (or accredited representative) to contact all other offices or NTSB employees who were involved in the investigation, obtain all records from them, and send them in conjunction with their own records regarding the investigation.   Moye Decl. ¶ 20.   The IIC (or accredited representative) serves as the central point of contact for the FOIA Office with regard to the

7

request, because the IIC supervises all personnel and offices throughout the investigation, and closely works with other NTSB employees who are involved in the investigation. Moye Decl. ¶ 20. Therefore, contacting the IIC or accredited representative is the most efficient and reliable way to acquire all relevant records in a timely manner. Moye Decl. ¶ 20. Thus, upon receipt of plaintiff's FOIA request, the NTSB FOIA Office notified personnel in the NTSB's Office of Aviation Safety and the Office of Research and Engineering of the existence of plaintiff's request, as the Office of Aviation Safety and the Office of Research and Engineering are the offices in which employees conducting these investigations work, and therefore, are the offices in which records within the scope of plaintiff's FOIA request might be located. Moye Decl. ¶ 16. Informing these NTSB offices of the specifics of plaintiff's FOIA request, the FOIA Office and/or the Office of General Counsel requested that a search be conducted for any records within the scope of plaintiff's request. Moye Decl. ¶ 16.

**NTSB Id. No. IAD00WA069**

14. The accident identified by NTSB Id. No. IAD00WA069 involved a Sikorsky model S-76A helicopter accident that occurred in Navegantes, Brazil on August 2, 2000, for which Thomas Conroy, a now deceased former employee of the NTSB, served as the U.S. Accredited Representative. See Plaintiff's FOIA request.

**NTSB Id. No. WAS01WA015**

15. The accident identified by NTSB Id. No. WAS01WA015 involved a Sikorsky model S-76B helicopter accident that occurred near Po'hang, Korea on June 5, 2001, for which Thomas Conroy, a now deceased former employee of the NTSB, served as the U.S. Accredited Representative. See Plaintiff's FOIA request.

**NTSB Id. No. IAD00WA029**

16. The accident identified by NTSB Id. No. IAD00WA029 involved a Sikorsky model S-76A helicopter accident that occurred near Kapap, Indonesia on March 8, 2000, for which Thomas Conroy, a now deceased former employee of the NTSB, served as the U.S. Accredited Representative. See Plaintiff's FOIA request.

**NTSB Id. No. DCA97WA068**

17. The accident identified by NTSB Id. No. DCA97WA068 involved a Sikorsky model S-76B helicopter accident that occurred near Omeath, Ireland on December 12, 1996. See Plaintiff's FOIA request. Thomas Conroy, a now deceased former employee of the NTSB, served as the U.S. Accredited Representative. See Moye Decl. ¶ 18.

**NTSB Id. No. DCA98WA014**

18. The accident identified by NTSB Id. No. DCA98WA014 involved a Sikorsky model S-76B helicopter accident that occurred in the North Sea off the coast of the Netherlands on December 20, 1997. See Plaintiff's FOIA request. Thomas Conroy, a now deceased former employee of the NTSB, served as the U.S. Accredited Representative. See Moye Decl. ¶ 18.

**NTSB's Processing of Plaintiff's Requests Relating to All Thomas Conroy Investigations (NTSB Id. Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068 and DCA98WA014)**

19. In reviewing plaintiff's request for all records from eight different investigations, the NTSB FOIA Office and Office of General Counsel determined that it would be most efficient to respond to plaintiff's requests for records from Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014 at once. Moye Decl. ¶ 52.

9

20. As stated above, Mr. Tom Conroy, who passed away suddenly in February 2005, served as the United States accredited representative for Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014. Moye Decl. ¶ 53.

21. Shortly after Mr. Conroy's death, Mr. Jeff Guzzetti, in his capacity as Deputy Director of Aviation Safety, determined that the Office of Aviation Safety needed to use Mr. Conroy's former office as a workstation for visiting regional investigators. Declaration of Jeffrey Guzzetti ¶ 4 ("Guzzetti Decl."). As such, Mr. Guzzetti discarded all records from closed investigations that pre-dated 2002, consistent with the NTSB's record retention practices and policies. Guzzetti Decl. ¶¶ 5-8.

22. Despite knowing that Mr. Guzzetti had discarded all hard copies of records from Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014, the FOIA Office, in conjunction with the Office of General Counsel, inquired of Mr. Conroy's immediate supervisor with regard to any records from the five aforementioned investigations. Moye Decl. ¶ 55.

23. At the time of his death, Mr. Conroy's immediate supervisor was Mr. Dennis Jones. Moye Decl. ¶ 56; Declaration of Dennis L. Jones ¶ 17 ("Jones Decl."). Mr. Jones had a small stack of records that he kept from Mr. Conroy's office before Mr. Guzzetti cleaned out Mr. Conroy's office. Jones Decl. ¶ 22. Mr. Jones searched this stack of records for any records regarding Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014. Jones Decl. ¶ 22. In his search, Mr. Jones located files containing records from Investigation No. DCA98WA014. Jones Decl. ¶ 23.

24. The NTSB did not find any other hard copies of records that Mr. Conroy produced or acquired with regard to Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014. Moye Decl. ¶ 59.

25. The NTSB's FOIA Office, in conjunction with the Office of General Counsel, asked personnel from the Computer Service Division in the NTSB Office of Chief Information Officer (CIO) to assist with a search for electronic records and e-mail correspondence from Mr. Conroy's former network folder and e-mail account. Moye Decl. ¶ 60.

26. Staff from the Computer Service Division allowed Mr. Dennis Jones and Mr. Alexander Lemishko to access Mr. Conroy's former network folder and e-mail account. Moye Decl. ¶ 61.

27. Mr. Jones and Mr. Lemishko conducted a search of Mr. Conroy's former e-mail account for records from Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014. Moye Decl. ¶ 61-62; Jones Decl. ¶¶ 19, 21; Declaration of Alexander Lemishko ¶¶ 37-40 ("Lemishko Decl."). Mr. Lemishko copied all e-mail correspondence from each of the appropriate folders and submitted it to the appropriate NTSB employee, in response to plaintiff's FOIA request. Lemishko Decl. ¶ 39.

28. Mr. Lemishko conducted a search of Mr. Conroy's network folder for all electronic records from Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014. Lemishko Decl. ¶ 30. Mr. Lemishko completed this search using the Microsoft Windows 2002 search function; specifically, in the "containing text" field, Mr. Lemishko inserted all possible queries that would capture all the requisite records, such as each of the five investigation numbers listed above, each aircraft's unique registration

11

number, as well as "Sikorsky," "S-76," "S-76A," "SK-76A," and "S-76B." Lemishko Decl. ¶¶ 30-31. This search resulted in a wide array of records, including some of Mr. Conroy's personal records, such as his employment records that mentioned his experience in investigating Sikorsky aircraft accidents. Lemishko Decl. ¶ 32. Mr. Lemishko submitted all potentially responsive records to the appropriate NTSB employee for processing in accordance with FOIA. Lemishko Decl. ¶ 33.

29. In addition to searching Mr. Conroy's electronic files, e-mail correspondence, and any remaining hard copies of records, the NTSB FOIA Office also asked Mr. Bob MacIntosh to conduct a search for any records regarding Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014. Moye Decl. ¶ 64. Mr. MacIntosh serves as the NTSB's specialist in international investigations and the Board's compliance with Annex 13 of the Convention on International Civil Aviation international investigations. Moye Decl. ¶ 64. Mr. MacIntosh maintains all of his records from all international investigations in a single filing cabinet, organized by investigation number. Moye Decl. ¶ 64. After conducting a search of this filing cabinet for all records related to Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014, Mr. MacIntosh located two small file folders: one file folder contained records from Investigation No. DCA98WA014, and the other file folder contained records from Investigation No. DCA97WA068. Moye Decl. ¶ 64. Mr. MacIntosh submitted both folders, and the records therein, to the NTSB FOIA Office for review. Moye Decl. ¶ 64.

30. Overall, even though Mr. Conroy has passed away, the NTSB FOIA Office worked with Mr. Conroy's supervisors and colleagues in order to determine where all records regarding

Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97WA068, and DCA98WA014 would be located.  Moye Decl. ¶ 65.

31.  After gathering all electronic records, e-mail correspondence, and hard copies of records from each of the aforementioned NTSB employees, the NTSB Office of General Counsel processed the records by reviewing each record, segregating the records as necessary, making release determinations on each record, and redacting certain text in the records, where withholding of the information was justified via a FOIA exemption.  Moye Decl. ¶ 66.  The NTSB sent all records subject to release (275 pages of records, as well as three photographs and one electronic record, on a computer disk), as well as a letter of response explaining the applicability of all exemptions that the NTSB applied in making release determinations, to plaintiff via messenger delivery on August 14, 2006.  Moye Decl. ¶ 66.

**NTSB Id. No. FTW01LA176**

32.  The accident identified by NTSB Id. No. FTW01LA176 involved a Sikorsky model S-76B helicopter accident that occurred in New Iberia, Louisiana on November 25, 2001.  See Plaintiff's FOIA request.  Alex Lemishko served as the IIC of the investigation.  See Lemishko Decl. ¶ 3.

33.  In accordance with the procedure described above for locating records in response to a FOIA request, appropriate personnel contacted Mr. Lemishko, the IIC for NTSB Investigation No. FTW01LA176, Mr. Alex Lemishko.  Moye Decl. ¶ 31.

34.  Mr. Lemishko verified that Investigation No. FTW01LA176 was a limited investigation in which he did not visit the accident site or create any investigative records that are not publicly available on the NTSB website.  Lemishko Decl. ¶¶ 4-9.  Mr. Lemishko stated

that he rarely keeps records, if any exist, from limited investigations. Lemishko Decl. ¶ 11. Thus, the only available records are accessible by the public by submitting a query on the database's query web page, *available at* **http://www.ntsb.gov/ntsb/query.asp.**  Moye Decl. ¶ 32.

35. Although Mr. Lemishko was confident that he did not maintain any records from Investigation No. FTW01LA176, he nevertheless searched his network folder, which contains all electronic records from investigations in which he served as the IIC, and did not locate any records from Investigation No. FTW01LA176. Lemishko Decl. ¶¶ 13-14.

36. In the interest of conducting as thorough a search as possible for any records regarding Investigation No. FTW01LA176, Mr. Lemishko contacted the Regional Director for the NTSB regional office in Arlington, Texas, Mr. Hector Cassanova. Mr. Casanova searched Mr. Lemishko's former office space at the NTSB South Central Regional Office, which is the location in which records would be located from any investigations in which Mr. Lemishko served as IIC. Declaration of Hector Casanova ¶¶ 7-9 ("Casanova Decl."). Mr. Casanova did not locate any records from Investigation No. FTW01LA176. Casanova Decl. ¶ 10.

37. The NTSB FOIA Office, in conjunction with the NTSB Office of General Counsel, sent a letter to plaintiff dated July 3, 2006, which stated that the NTSB had conducted a reasonable search for all records from Investigation No. FTW01LA176, and did not locate any records that were not publicly available. Moye Decl. ¶ 40.

**NTSB Id. No. NYC86MA148**

38. The accident identified by NTSB Id. No. NYC86MA148 involved a Sikorsky model S-76B helicopter accident that occurred in Sutton, Massachusetts on June 6, 1986. See

14

Plaintiff's FOIA request. Dennis Jones served as the Investigator-In-Charge ("IIC") of the investigation. See Jones Decl. ¶ 3.

39. With regard to NTSB Investigation No. NYC86MA148, the appropriate IIC , Mr. Dennis Jones, was contacted and notified of the existence of a FOIA request. Moye Decl. ¶ 21. At the time of the investigation, Mr. Jones worked in the NTSB's regional office in Jamaica, New York. Jones Decl. ¶ 4. Subsequent to the investigation, Mr. Jones moved to the NTSB's regional office in Parsippany, New Jersey and then to NTSB's headquarters in Washington, D.C. Jones Decl. ¶¶ 5-8.

40. Mr. Jones conducted a search of his files relating to investigations he conducted and found no files or records from Investigation No. NYC86MA148. Jones Decl. ¶ 12. Thus, all the files created by Mr. Jones relating to Investigation No. NYC86MA148 are available in the public docket of records for the investigation, and he did not retain any other records pertaining to Investigation No. NYC86MA148. Jones Decl. ¶ 14.

41. NTSB staff also inquired of Mr. James Wildey, who presently serves as the Chief of the Materials Laboratory in the Office of Research and Engineering at the NTSB regarding any records from NYC86MA148. Moye Decl. ¶ 23. The Materials Laboratory Division of the Office of Research and Engineering maintains a comprehensive database tracking all work that the Division performs on all materials that Division studies. Declaration of James F. Wildey ¶ 4 ("Wildey Decl.").

42. Mr. Wildey inserted the NTSB investigation number, NYC86MA148, into the Materials Laboratory database. Wildey Decl. ¶ 6. The database indicated that the Materials Laboratory had examined two pieces of luggage from the accident that was the subject of

15

Investigation No. NYC86MA148, upon the request of the Federal Bureau of Investigation. Wildey Decl. ¶ 7. Recognizing that the aforementioned Materials Laboratory database entry, although brief, was an "agency record" under the FOIA, Mr. Wildey printed the database entry. Moye Decl. ¶ 25; Wildey Decl. ¶ 8.

43. The NTSB FOIA Office released this record, in full, to plaintiff on June 29, 2006. Moye Decl. ¶ 27.

**NTSB Id. No. DFW05MA230**

44. The accident identified by NTSB Id. No. DFW05MA230 involved a Sikorsky model SK-76A [actually a S-76A] helicopter accident that occurred in the Gulf of Mexico southeast of Sabine Pass, Texas on September 6, 2005. See Plaintiff's FOIA request. Alex Lemishko currently serves as the Investigator-In-Charge ("IIC") of the investigation, which is currently an on-going investigation. See Lemishko Decl. ¶¶ 16-17.

45. Upon receiving plaintiff's FOIA request for all records concerning Investigation No. DFW05MA230, staff in the NTSB's Office of General Counsel inquired of Mr. Lemishko with regard to the status of Investigation No. DFW05MA230. Moye Decl. ¶ 42.

46. As a policy, the NTSB does not release documents from pending investigations. Lemishko Decl. ¶ 19; Haueter Decl. ¶ 11. In fact, all outside parties to investigations that the NTSB conducts are required to sign a "party agreement," wherein they agree not to release any information while the investigation is ongoing. Lemishko Decl. ¶ 19.

47. Records relating to pending or ongoing investigations are not released because such a release would severely impede the progress of the investigation. Lemishko Decl. ¶ 20; Haueter Decl. ¶¶ 12-15. Often, records from pending investigations consist of notes containing

16

deliberations and ideas resulting from brainstorming. Lemishko Decl. ¶ 20; Haueter Decl. ¶ 12. Releasing such records would significantly chill the deliberations fo the NTSB and parties who are participating in the investigation. Lemishko Decl. ¶ 20; Haueter Decl. ¶ 12.

48. Moreover, releasing records from pending investigations would affect the progress of the investigation, because requesters receiving the records would likely misunderstand the records, as well as the parties' deliberations and, consequently, speculate on the importance of certain aspects of the accident. Haueter Decl. ¶ 13. Such public speculation would cause confusion and distract the NTSB and participating parties, thereby significantly slowing the progress of the investigation. Lemishko Decl. ¶ 20; Haueter Decl. ¶ 12. Thus, releasing records relating to ongoing and pending investigations would impede the progress of the investigation. Lemishko Decl. ¶¶ 22-24; Haueter Decl. ¶¶ 12-15.

49. The FOIA Office and Office of General Counsel categorically reviewed the existing records from Investigation No. DFW05MA230. Moye Decl. ¶ 44. Currently, the NTSB has assembled the following groups for Investigation No. DFW05MA230:

    a.      Human Performance Group

    b.      Operations Group

    c.      Cockpit Voice Recorder (CVR) Group

    d.      Maintenance Records Group

    e.      Survival Factors Group

Moye Decl. ¶ 44.

50. Each of these groups is currently conducting an investigation into specific aspects of the accident that is the subject of Investigation No. DFW05MA230. Moye Decl. ¶ 45. An

17

NTSB employee serves as group chairperson for each of the groups listed above. Moye Decl. ¶ 45.

51. The FOIA Office, in conjunction with the Office of General Counsel at the NTSB, has inquired of each of the aforementioned group chairpersons regarding the status of Investigation No. DFW05MA230. Moye Decl. ¶ 46. Each group chairperson has verified that Investigation No. DFW05MA230 is ongoing. Each group chairperson stated that they are currently investigating their group's aspects of Investigation No. DFW05MA230. Moye Decl. ¶ 47.

52. Based on the aforementioned reasons, the NTSB sent a letter to plaintiff, dated July 3, 2006, explaining that the NTSB was withholding records from Investigation No. DFW05MA230 because the investigation was pending; in the response, the NTSB cited Exemptions 2, 5, and 7(A) as justifications for the NTSB's withholding of records from Investigation No. DFW05MA230. Moye Decl. ¶ 51.

**<u>NTSB Methodology for Designating Withheld Information</u>**

53. As the NTSB produced redacted documents to plaintiff, it noted on the face of those documents the categories of exemptions that identify the information withheld pursuant to FOIA. For example, if (b)(6) or exemption 6 appears on the face of the documents, that annotation refers to Exemption (b)(6) of FOIA concerning personal privacy information that was withheld because the disclosure of the information would be a clearly unwanted invasion of privacy. Moye Decl. ¶ 68. In addition, a separate narrative description of the information withheld and the justification is provided for each record in which information was withheld in part or in full. In preparing the narrative descriptions, the appropriate NTSB employees carefully reviewed each

document. Moye Decl. ¶ 68. The language contained in each narrative description is specific to each document. Moye Decl. ¶ 69. To describe in more detail the information being withheld could identify the material that the NTSB validly seeks to protect. Moye Decl. ¶ 69. The narrative descriptions and the coding on the documents are used to aid the Court's review of the NTSB's explanations for the FOIA exemptions used to withhold the protected material. Moye Decl. ¶ 69.

54. The NTSB made every effort to provide the plaintiff with all reasonably segregable portions of the material requested. Moye Decl. ¶ 70. No reasonably segregable nonexempt portions have been withheld from plaintiff. Moye Decl. ¶ 70. Accordingly, all information withheld is exempt from disclosure pursuant to a FOIA exemption or is not reasonably segregable because it is so intertwined with protected material that segregation is not possible or its release would have revealed the underlying protected material. Moye Decl. ¶ 70.

55. For several records that are within the scope of plaintiff's FOIA request, the NTSB exercised its discretion to release portions or records that the FOIA exempts from disclosure. Moye Decl. ¶ 71. Overall, the NTSB has carefully reviewed all records within the scope of plaintiff's FOIA request, and has erred on the side of disclosure in response to plaintiff's FOIA request. Moye Decl. ¶ 71.

**NTSB's Redaction of Records**

56. Exhibit 1 to the Moye Declaration consists of a chart that includes each page number containing a redaction of text that is exempt from disclosure under FOIA, a description of the redacted text, and an explanation of the NTSB's application FOIA exemptions. Moye Decl. ¶ 72. The text that the NTSB redacted pursuant to Exemption 6 in these pages clearly contained

19

personal information for non-NTSB employees, the release of which would cause an unwarranted invasion of privacy to those non-NTSB employees; therefore, the NTSB invoked Exemption 6 to withhold the text.  Moye Decl. ¶ 73.  The NTSB carefully weighed any public interest in disclosing the text against the privacy interest at stake, and found that redacting the text was consistent with Exemption 6 of the FOIA.  Moye Decl. ¶ 73.

57.  In addition, the chart at Exhibit 1 to the Moye Declaration contains entries that include each page number containing redactions of text that is exempt from disclosure under Exemptions 4 and 2 of the FOIA.  Moye Decl. ¶ 74.

> a.  Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4). While conducting the investigations from which plaintiff requested records, the NTSB utilized some proprietary information from two non-government sources. Pursuant to Exemption 4 of the FOIA, commercially sensitive or proprietary information voluntarily given to a government agency "of a kind that would customarily not be released to the public by the person from whom it was obtained" is exempt from disclosure under the FOIA.  Critical Mass Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879  (D.C. Cir. 1992).  When the NTSB oversaw the aforementioned investigations, it obtained information without the assistance of the Board's Office of General Counsel or devices such as subpoenas. Therefore, the submission of the information at issue to the NTSB was wholly voluntary.  Moye Decl. ¶ 74.

b.  In order to ensure that the information at issue was exempt from disclosure pursuant to Exemption 4, the NTSB contacted both private entities that voluntarily provided the proprietary data to the NTSB, in order to inquire about the status of the aforementioned proprietary information.  These private entities specifically stated that they would not customarily release these pages to the public; in addition, they articulated the commercial disadvantage they would suffer if the NTSB were to release the pages under the FOIA, in accordance with Critical Mass, 975 F.2d at 878-79.  As a result, the NTSB determined that these pages were exempt from disclosure under the FOIA.  Moye Decl. ¶ 74.

c.  In addition to invoking Exemption 4, the NTSB's response letter also informed plaintiff that Exemption 2 applied to withhold some of the redacted text, in accordance with the annotations on the released records.  Specifically, the NTSB redacted some information from the enclosed records where release of the information would cause the NTSB to circumvent its statutory purpose and instructive regulations.  The NTSB determined that such information was exempt from the disclosure requirements of the FOIA under Exemption 2.  Moye Decl. ¶ 74.  The NTSB, in investigating accidents, gathers information from manufacturers, operators, and various other "parties" in order to find the probable cause of each accident.  Haueter Decl. ¶¶ 6-10.  The NTSB's "party system" is absolutely critical to the fulfillment of the Board's mission, which is to investigate civilian transportation occurrences in an independent fashion.  Haueter Decl. ¶¶ 6-10.  See also 49 U.S.C. § 1111; 49 C.F.R. §§ 800.2, 800.3(a) (listing

21

the Board's general functions and responsibilities); S. Rep. No. 103-150, at 231

(1993) (stating that the Board was established as an independent agency, and that

the Board's "effectiveness depends on its reputation for impartial and accurate

accident reports").  Disclosure of records that reflect parties' deliberations would

undermine the NTSB's effectiveness, because it would instill severe reluctance in

parties to participate fully in the Board's investigations.  Haueter Decl. ¶ 12.  The

information that the NTSB obtains from such parties is critical to the Board's

ability to investigate transportation accidents effectively.  Haueter Decl. ¶¶ 14-15,

20.  Such a compelling risk of circumvention of the NTSB's statutory purpose

and regulations allows for the application of Exemption 2, in conjunction with

Exemption 4, to plaintiff's request.  Moye Decl. ¶ 74.

58.  Likewise, with regard to certain portions of correspondence between foreign

investigators-in-charge and the NTSB, Exemptions 2, 3 and 5 allowed for redactions of opinions

and deliberations from foreign investigators-in-charge, or text that encompassed such opinions or

questions that reflected deliberations.  Moye Decl. ¶ 75.

a.  First, Exemption 3 of the FOIA allows agencies to withhold information that

another statute prohibits from disclosure if the statute either, "(A) requires that the

matters be withheld from the public in such a manner as to leave no discretion on

the issue, or (B) establishes particular criteria for withholding or refers to

particular types of matters to be withheld."  Moye Decl. ¶ 75 (quoting 5 U.S.C. §

552(b)(3)).  Five of the eight investigations from which plaintiff requested records

were international aviation investigations.  Moye Decl. ¶ 75.  In all foreign

22

aviation investigations, the NTSB is required to comply with Aircraft Accident

and Incident Investigation, Annex 13 to the Convention on International Civil

Aviation (9th ed. 2001). Moye Decl. ¶ 75. Paragraphs 5.12 and 5.12.1 of Annex

13 provide:

> 5.12   The State conducting the investigation of an accident or
> incident shall not make the following records available for purposes
> other than accident or incident investigation … :
>  a)      all statements taken from persons by the investigation
>         authorities in the course of their investigation;
>  b)    all communications between persons having been involved in
>         the operation of the aircraft;
>  c)   medical or private information regarding persons involved in the
>         accident or incident;
>  d)   cockpit voice recordings and transcripts from such recordings;
>         and
>  e)    opinions expressed in the analysis of information, including
>         flight recorder information.
>
> 5.12.1   These records shall be included in the final report or its
> appendices only when pertinent to the analysis of the accident or
> incident. Parts of the records not relevant to the analysis shall not be
> disclosed.

Moye Decl. ¶ 75 (quoting Annex 13). This prohibition on the disclosure of

information that countries gather during civil aviation investigations falls within

the purview of Exemption 3 of the FOIA, because the United States and the

countries involved in the investigations at issue are signatories to the Chicago

Convention, which implemented the Annexes to the Convention on International

Civil Aviation. Moye Decl. ¶ 75. The NTSB's regulations indicate the Board's

involvement in international aviation investigations, pursuant to this agreement,

49 C.F.R. § 831.2(a)(3). Moye Decl. ¶ 75. Given the provisions of Annex 13

quoted above, the NTSB's disclosure of such prohibited information would

directly contravene these specific provisions of Annex 13.  Moye Decl. ¶ 75.  In

addition, the Note that accompanies ¶¶ 5.12 and 5.12.1 illustrates the purpose of

these provisions:

> Information contained in the records listed above … could be
> utilized inappropriately for subsequent disciplinary, civil,
> administrative and criminal proceedings.  If such information is
> distributed, it may, in the future, no longer be openly disclosed
> to investigators.  Lack of access to such information would
> impede the investigation process and seriously affect flight
> safety.

Moye Decl. ¶ 75 (quoting Annex13).  Therefore, the NTSB redacted some

information from the enclosed records in accordance with Exemption 3 and

Annex 13.  Moye Decl. ¶ 75.

b.  In addition to Exemption 3 of the FOIA, the NTSB also invoked Exemption 5 for

statements in which foreign investigators-in-charge expressed opinions, made

comments, or asked questions that encompassed their predecisional deliberations

during the investigation.  Moye Decl. ¶ 75.  Such statements are exempt from the

disclosure requirements of the FOIA pursuant to Exemption 5, 5 U.S.C. §

552(b)(5), which exempts from disclosure agency records that are preliminary or

deliberative.  The NTSB cannot guarantee preliminary materials, such as records

that encompass preliminary opinions or questions that reflect deliberations, as

accurate or complete; therefore, release of such information would result in

confusion and compromise the Board's work.  Moye Decl. ¶ 75.  In addition,

material reflecting the NTSB's deliberative process is exempt from disclosure in

order to ensure the free flow of information during the course of the Board's investigations.  Moye Decl. ¶ 75.

c.  Finally, the NTSB also invoked Exemption 2 in conjunction with Exemptions 3 and 5 of the FOIA, to redact a text containing preliminary information that reflects the NTSB's deliberative process and opinions from foreign investigators. Moye Decl. ¶ 75.  As I explained above, disclosure of records that reflect parties' and foreign investigators' deliberations would undermine the NTSB's effectiveness, because it would instill significant reluctance in parties and foreign investigators to participate fully in the Board's investigations.  Moye Decl. ¶ 75. The information that the NTSB obtains from foreign investigators is critical to the Board's ability to assist with foreign aviation accidents effectively; therefore, release of such information would cause the NTSB to circumvent the provisions of Annex 13, which requires the NTSB to assist with certain foreign investigations.  Moye Decl. ¶ 75.  Such a compelling risk of circumvention of the NTSB's statutory purpose and Annex 13 allows for the application of Exemption 2, in conjunction with Exemptions 3 and 5.  Moye Decl. ¶ 75.

**Withheld Records**

59.  The NTSB also withheld 188 pages from plaintiff in full.  Moye Decl. ¶ 76.

60.  Exhibits 2 - 8 to the Moye Declaration contain detailed descriptions of each record that the NTSB withheld in full from plaintiff.  Moye Decl. ¶ 77.

61.  The NTSB withheld 154 pages in full based on Exemptions 2 and 4 of the FOIA.  5 U.S.C. § 552(b)(2), (4).  Moye Decl. ¶ 78.

25

a.  In the NTSB's response to plaintiff's request for records from Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97068, and DCA98WA014, the NTSB informed plaintiff that it was withholding 103 pages based on Exemptions 2 and 4 of the FOIA.  Moye Decl. ¶ 78. The FOIA does not require agencies to specify an exact number of pages that the agency is withholding, see 5 U.S.C. § 552(a)(6)(F) (stating that, "[i]n denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request").

b.  In carefully reviewing the records again for the attached <u>Vaughn</u> index, the NTSB concluded that 154 pages is the exact number of pages that are exempt from disclosure pursuant to Exemptions 2 and 4 of the FOIA.  Moye Decl. ¶ 78.

62.  The NTSB withheld 64 photos from plaintiff based on Exemptions 2 and 4 of the FOIA.  5 U.S.C. § 552(b)(2), (4).  Moye Decl. ¶ 79.

a.  In the NTSB's response to plaintiff's request for records from Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97068, and DCA98WA014, the NTSB  informed plaintiff that the NTSB was withholding 101 photographs based on Exemptions 2 and 4 of the FOIA.  As stated above, the FOIA does not require agencies to specify an exact number of pages that the agency is withholding, see 5 U.S.C. § 552(a)(6)(F).

b.  In carefully reviewing the records again for the attached <u>Vaughn</u> index, the NTSB concluded that 64 photographs is the exact number of photographs that are

26

exempt    from disclosure pursuant to Exemptions 2 and 4 of the FOIA.  Moye Decl.

¶ 79.

63.   These erroneous estimates discussed above were the result of a misidentification of

which records and photographs were responsive to plaintiff's request.  Moye Decl. ¶ 80.  As

stated above, Mr. Tom Conroy served as the United States accredited representative for

Investigation Nos. IAD00WA069, WAS01WA015, IAD00WA029, DCA97068, and

DCA98WA014.  Moye Decl. ¶ 80.  Given Mr. Conroy's sudden death, the NTSB could not

inquire of any NTSB employee who was closely familiar with each of these investigations.

Moye Decl. ¶ 80.   Therefore, in the interest of conducting as thorough a search as possible and

releasing as many records as possible, the NTSB erroneously identified some photographs as

responsive and exempt from disclosure pursuant to Exemptions 2 and 4; in reality, these records

are not even within the scope of plaintiff's request, but are from other investigations, from which

plaintiff did not request records.  Moye Decl. ¶ 80.  Therefore, the NTSB's response to plaintiff's

request included a miscalculated estimate of pages and photographs that are exempt from

disclosure under the FOIA.  Moye Decl. ¶ 80.

64.   Each document in Exhibits 2 – 8 to the Moye Declaration describes all records that

the NTSB determined were exempt from release under the FOIA.  Moye Decl. ¶ 81.

a.  Exhibit 2 contains descriptions of the five (5) pages of records

that the NTSB is withholding pursuant to Exemption 2 ("low") of the FOIA.  5

U.S.C. § 552(b)(2) (exempting records that are "related solely to the internal

personnel rules and practices of an agency").

b.   Exhibit 3 contains descriptions of the 13 pages of records that the NTSB is withholding pursuant to Exemptions 2 and 3 of the FOIA.  5 U.S.C. § 552(b)(2), (3).

c.   Exhibit 4 contains descriptions of the 154 pages of records and 64 photographs that the NTSB is withholding pursuant to Exemptions 2 and 4 of the FOIA.  5 U.S.C. § 552(b)(2), (4).

d.   Exhibit 5 contains a description of the one (1) page of a record that the NTSB is withholding in full pursuant to Exemptions 2, 3, 4, and 5 of the FOIA.  5 U.S.C. § 552(b)(2), (3), (4), and (5).

e.   Exhibit 6 contains descriptions of the five (5) pages of records that the NTSB is withholding pursuant to Exemptions 2, 3, and 5 of the FOIA.  5 U.S.C. § 552(b)(2), (3), (5).

f.   Exhibit 7 contains descriptions of the seven (7) pages of records that the NTSB is withholding pursuant to Exemption 5 of the FOIA.  5 U.S.C. § 552(b)(5).

g.   Exhibit 8 contains descriptions of the three (3) pages of records that the NTSB is withholding pursuant to Exemption 6 of the FOIA.  5 U.S.C. § 552(b)(6).

September 14, 2006                          Respectfully submitted,

_____/s/_____

KENNETH L. WAINSTEIN, D.C.  BAR# 451058
United States Attorney


_____/s/_____

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____

JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-1249
(202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

BYRON L. PICKARD,       )
                            )
          Plaintiff,     )    No. 06-1039 (JR)
        v.                  )
                            )
NATIONAL TRANSPORTATION     )
     SAFETY BOARD,       )
                            )
         Defendant.    )
_____)

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

On April 26, 2006, the law firm of Thelen Reid & Priest LLP filed a FOIA request with

the National Transportation Safety Board ("NTSB") seeking records relating to accident

investigations conducted by the NTSB.  As explained in detail in defendant's statement of

material facts not in dispute and the accompanying declarations of NTSB employees, the NTSB

has produced all responsive documents except for those which are not releasable either in whole

or in part under FOIA.  Accordingly, the NTSB has complied with its FOIA obligations and

summary judgment is appropriate in its favor.

## FACTS

The NTSB hereby incorporates its Statement of Material Facts Not in Dispute.

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

Where no genuine dispute exists as to any material fact, summary judgment is required.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  A genuine issue of material fact is one

that would change the outcome of the litigation.  Id. at 247.  "The burden on the moving party

1

may be discharged by 'showing' -- that is, pointing out to the [Court] -- that there is an absence of evidence to support the non-moving party's case."  Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987).

Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Thus, to avoid summary judgment, the Plaintiff must present some objective evidence that would enable the court to find he is entitled to relief.  In Celotex Corp. v. Catrett, the Supreme Court held that, in responding to a proper motion for summary judgment, the party who bears the burden of proof on an issue at trial must "make a sufficient showing on an essential element of [his] case" to establish a genuine dispute.  477 U.S. 317, 322-23 (1986).

In Anderson, the Supreme Court explained under what circumstances summary judgment is appropriate:

> If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted . . . [T]he mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff.

Anderson, 477 U.S. at 252; see also Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir.  1987) (the non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor).  In Celotex, the Supreme Court further instructed that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

2

The summary judgment standards set forth above also apply to FOIA cases, which are typically decided on motions for summary judgment.[1] See Cappabianca v. Commissioner, U.S. Customs Serv., 847 F. Supp. 1558, 1562 (M.D. Fla. 1994) ("once documents in issue are properly identified, FOIA cases should be handled on motions for summary judgment") (citing Miscavige v. IRS, 2 F.3d 366, 368 (11th Cir. 1993)).  In a FOIA suit an agency is entitled to summary judgment once it demonstrates that no material facts are in dispute and that each document that falls within the class requested either has been produced, not withheld, is unidentifiable, or is exempt from disclosure.  Students Against Genocide v. Dept. of State, 257 F.3d 828, 833 (D.C. Cir. 2001); Weisberg v. U.S. Dept. of Justice, 627 F.2d 365, 368 (D.C. Cir. 1980).

An agency satisfies the summary judgment requirements in a FOIA case by providing the Court and the Plaintiff with affidavits or declarations and other evidence which show that the documents are exempt from disclosure.  Hayden v. National Security Agency Cent. Sec. Serv., 608 F.2d 1381, 1384, 1386 (D.C. Cir. 1979), cert. denied, 446 U.S. 937 (1980); Church of Scientology v. U.S. Dept. of Army, 611 F.2d 738, 742 (9th Cir. 1980).  Summary judgment may be awarded to an agency in a FOIA case solely on the basis of agency affidavits [or declarations] "when the affidavits describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" Trans Union LLC v. Federal Trade Commission, 141 F. Supp. 2d

---

[1] For purposes of summary judgment, an agency's decision to withhold information from a FOIA requester is subject to de novo review by the courts.  Hayden v. National Security Agency Cent. Sec. Serv., 608 F.2d 1381, 1384 (D.C. Cir. 1979), cert. denied, 446 U.S. 937 (1980).

62, 67 (D.D.C. 2001) (quoting Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981)); see also Public Citizen, Inc. v. Dept. of State, 100 F. Supp. 2d 10, 16 (D.D.C. 2000); McGhee v. Central Intelligence Agency, 697 F.2d 1095, 1102 (D.C. Cir. 1983); Citizens Commission on Human Rights v. FDA, 45 F.3d 1325, 1329 (9th Cir. 1995); Bowen v. FDA, 925 F.2d 1224, 1227 (9th Cir. 1991).  When the pleadings, supplemented by affidavits or declarations, show no genuine issue as to any material fact and the defendant is entitled to judgment as a matter of law, summary judgment should be granted to the defendant.  Perry v. Block, 684 F.2d 121 (D.C. Cir. 1982).

## II.    THE NTSB CONDUCTED A REASONABLE SEARCH

In responding to a FOIA request, an agency is under a duty to conduct a reasonable search for responsive records.  Oglesby v. U.S. Dept. of Army, 920 F.2d 57, 68 (D.C. Cir. 1990); Cleary, Gottlieb, Steen & Hamilton v. Dept. of Health, et al., 844 F. Supp. 770, 776 (D.D.C. 1993); Weisberg v. U.S. Dept. of Justice, 705 F.2d 1344, 1352 (D.C. Cir. 1983).  This "reasonableness" standard focuses on the method of the search, not its results, so that a search is not unreasonable simply because it fails to produce relevant material.  Id. at 777 n.4.  An agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located.  Oglesby, 920 F.2d at 68.  Simply stated, the adequacy of  the search is "dependent upon the circumstances of the case."  Truitt v. Dept. of State, 897 F.2d 540, 542 (D.C. Cir. 1990).

The search standards under FOIA do not place upon the agency a requirement that it prove that all responsive documents have been located.  Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 892 n.7 (D.C. Cir. 1995).  It has been held that "'the search need only be

reasonable; it does not have to be exhaustive.'" Miller v. Dept. of State, 779 F.2d 1378, 1383 (8th Cir. 1985) citing National Cable Television Association v. FCC, 479 F.2d 183, 186 (D.C. Cir. 1973). Even when a requested document indisputably exists or once existed, summary judgment will not be defeated by an unsuccessful search for the document so long as the search was diligent. Nation Magazine, 71 F.3d at 892 n.7. Additionally, the mere fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it. Maynard v. CIA, 982 F.2d 546, 564 (1st Cir. 1993).

The burden rests with the agency to establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby, 920 F.2d at 68; see SafeCard Servs. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir. 1991). "An agency may prove the reasonableness of its search through affidavits of responsible agency officials so long as the affidavits are relatively detailed, non-conclusory and submitted in good faith." Miller, 779 F.2d at 1383; Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978). Though the "affidavits submitted by an agency are 'accorded a presumption of good faith,'" Carney v. Dept. of Justice, 19 F.3d 807, 812 (2d Cir. 1994), cert. denied, 513 U.S. 823 (1994) (quoting SafeCard Servs., 926 F.2d at 1200), the burden rests with the agency to demonstrate the adequacy of its search. Once the agency has met this burden through a show of convincing evidence, the burden shifts to the requester to rebut the evidence by a showing of bad faith on the part of the agency. Miller, 779 F.2d at 1383. A requester may not rebut agency affidavits with purely speculative allegations. See Carney, 19 F.3d at 813; SafeCard, 926 F.2d at 1200; Maynard v. CIA, 986 F.2d 547, 559-560 (1st Cir. 1993).

5

The fundamental question is not "whether there might exist any other documents responsive to the request, but rather whether the search for those documents was adequate." Steinberg v. Dept. of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting Weisberg v. Dept. of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

As explained in detail in defendant's statement of material facts and accompanying declarations, defendant conducted a reasonable search as required by FOIA. For those investigations where the NTSB could contact the Investigator-In-Charge of the investigation, the NTSB did so. Stmt. of Mat. Facts ¶¶ 32, 39 & 45. Those IICs, and others who would potentially be in possession of responsive materials, searched all records where responsive material would be located. Stmt. of Mat. Facts ¶¶ 34, 35, 36, 40, 41, 42 & 49. All responsive documents located regarding these investigations was forwarded to the NTSB FOIA Office for processing and potential release.[2] Stmt. of Mat. Facts ¶¶ 42 & 43.

For those investigations for which Thomas Conroy was the IIC, or the US Accredited Representative for a foreign investigation, the NTSB also conducted a reasonable search that comports with FOIA. As explained in detail in the Statement of Material Facts and accompanying declaration, Mr. Conroy passed away suddenly in 2005. Stmt. of Mat. Facts ¶ 20. Notwithstanding that the NTSB had discarded Mr. Conroy's pre-2002 investigation files following his death, see Stmt. of Mat. Facts ¶ 21, the NTSB contacted Mr. Conroy's former supervisor who reviewed his files for responsive documents. Stmt. of Mat. Facts. ¶ 23.

_____

[2] In total, the NTSB released records for one of the three investigations for which it could contact the IIC, i.e., investigation no. NYC86MA148. The NTSB located no responsive documents that were not publically available for investigation no. FTW01LA167 and, because investigation no. DFW05MA230 is an ongoing investigation, the NTSB withheld all documents relating to that investigation.

Similarly, the NTSB had other employees review Mr. Conroy's email and other electronic files for responsive documents.  Stmt. of Mat. Facts ¶¶ 25 - 30.  All responsive documents located were then sent to the NTSB FOIA Office for processing and potential release.  Stmt. of Mat. Facts ¶ 31.

## III.    THE NTSB SUBMITTED PROPER <u>VAUGHN</u> INDICES

In moving for summary judgment in a FOIA case, agencies must establish a proper basis for their withholding of responsive documents.  "In response to this special aspect of summary judgment in the FOIA context, agencies regularly submit affidavits . . . in support of their motions for summary judgment against FOIA Plaintiffs."  Judicial Watch v. U.S. Dept. of Health and Human Services, 27 F. Supp. 2d 240, 242 (D.D.C. 1998).  These declarations or affidavits (singly or collectively) are often referred to as a Vaughn index, after the case of Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977, 94 S. C. 1564 (1974).  There is no set formula for a Vaughn index.  "[I]t is well established that the critical elements of the Vaughn index lie in its function, and not in its form."  Kay v. FCC, 976 F. Supp. 23, 35 (D.D.C. 1997).  "The materials provided by the agency may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege."  Delaney, Midgail & Young, Chartered v. IRS, 826 F.2d 124, 128 (D.C. Cir. 1987).  See also Keys v. U.S. Dept. of Justice, 830 F.2d 337, 349 (D.C. Cir. 1987); Hinton v. Dept. of Justice, 844 F.2d 126, 129 (3d Cir. 1988).[3]

---

[3] "All that is required, and that is the least that is required, is that the requester and the trial judge be able to derive from the index a clear explanation of why each document or portion of a document withheld is putatively exempt from disclosure."  Id.  "The degree of specificity of itemization, justification, and correlation required in a particular case will, however, depend on the nature of the document at issue and the particular exemption asserted."  Information Acquisition Corp. v. Dept. of Justice, 444 F. Supp. 458, 462 (D.D.C. 1978).

The <u>Vaughn</u> Index serves a threefold purpose: (1) it identifies each document withheld; (2) it states the statutory exemption claimed; and (3) it explains how disclosure would damage the interests protected by the claimed exemption. <u>See</u> <u>Citizens Commission on Human Rights v. FDA</u>, 45 F.3d 1325, 1326 (9th Cir. 1995). "Of course the explanation of the exemption claim and the descriptions of withheld material need not be so detailed as to reveal that which the to agency wishes to conceal, but they must be sufficiently specific to permit a reasoned judgment as whether the material is actually exempt under FOIA." <u>Founding Church of Scientology v. Bell</u>, 603 F.2d 945, 949 (D.C. Cir. 1979).

Together with its Statement of Material Facts, the NTSB has submitted the declarations of Melba D. Moye, Alexander Lemishko, Jeffrey B. Guzzetti, Dennis L. Jones, James F. Wildey, Hector Casanova, and Thomas E. Haueter. These declarations describe in detail the potential location of responsive documents, the scope of the search, the processing of responsive documents, and the withholding and rationale for the withholdings for each of the records withheld in part or in whole. Thus, the declarations provided by the NTSB provide the Court a reasonable basis to evaluate the agency's processing of plaintiff's FOIA request and applicable withholdings.

## IV.    THE NTSB PROPERLY INVOKED FOIA EXEMPTIONS

As set forth in detail below, the NTSB withheld documents responsive to plaintiff's FOIA request under exemptions 2, 3, 4, 5, 6 and 7. <u>See</u> 5 U.S.C. §§ 552(b)(2) through (b)(7). Below are the legal standards for such withholdings.

8

A.     **The NTSB Properly Invoked Exemption 2**

Title 5 of the United States Code, section 552(b)(2) ("Exemption 2") exempts from

disclosure information "relating solely to the internal rules and practices of an agency."

Exemption 2 applies primarily to two types of materials: (1) internal agency matters so routine or

trivial that they could not be "subject to . . . a genuine and significant public interest;" and

(2) internal agency matters of some public interest "where disclosure may risk circumvention" of

statutes or agency regulations.  Department of Air Force v. Rose, 425 U.S. 352, 369-70 (1976);

National Treasury Employees Union v. United States Custom Serv., 802 F.2d 525, 528-30 (D.C.

Cir. 1986); Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1073-74 (D.C.

Cir. 1981); Windels, Marx, Davies & Ives v. Department of Commerce, 576 F. Supp. 405, 412

(D.D.C. 1983) (computer program qualifies as internal document).  Exemption 2 protects

routine, internal, administrative matters and functions of the NTSB which have no effect on the

public at large.

As explained in detail in paragraphs 57-58 and 61-64, the NTSB invoked Exemption 2 to

prevent the release of information that would circumvent the statutory purpose and instructive

regulations of the NTSB, and information that relates solely to the internal personnel rules and

practices of the agency.  See Stmt. of Mat. Facts ¶¶ 57-58 and 61-64.  Thus, the NTSB properly

invoked exemption 2 to redact responsive materials or withhold responsive material.

B.     **The NTSB Properly Invoked Exemption 3**

Title 5 U.S.C. § 552(b)(3) allows for the withholding or deletion of information

"specifically exempted from disclosure by statute (other than section 552(b) of this title),

provided that such statute (A) requires that the matters be withheld from the public in such a

9

manner as to leave no discretion on the issue, or (B) establishes particular criteria for

withholding or refers to particular types of matters to be withheld." Id. "Exemption 3 differs

from other FOIA exemptions in that its applicability depends less on the detailed factual contents

of specific documents; the *sole* issue for decision is the existence of a relevant statute and the

inclusion of withheld material within that statute's coverage." Goland v. CIA, 607 F.2d 339, 350

(D.C. Cir. 1978), cert. denied, 445 U.S. 927 (1980) (emphasis added).

As explained in detail in the Statement of Material Facts and accompanying declarations,

the United States is a signatory to the Convention on International Civil Aviation. See Stmt. of

Mat. Fact ¶¶ 7, 8 & 58. See also IAL Aircraft Holding, Inc. v. F.A.A., 206 F.3d 1042, 1044

(11th Cir. 2000), vacated on other grounds,  216 F.3d 1304 (11th Cir. 2000) ("The United States,

together with more than 180 other countries, is a signatory to the Convention on International

Civil Aviation"); City of Los Angeles Dept. of Airports v. U.S. Dept. of Transp.,103 F.3d 1027,

1038 (D.C. Cir. 1997) (noting that the Convention on International Civil Aviation, was opened

for signature Dec. 7, 1944 and ratified by the United States on August 9, 1946); Indianapolis

Airport Authority v. American Airlines, Inc. 733 F.2d 1262, 1266 (7th Cir. 1984) ("A treaty of

the United States, see British Caledonian Airways Ltd. v. Bond, 665 F.2d 1153, 1159 n. 3 (D.C.

Cir.1981), the Convention [on International Civil Aviation] has the force of a federal statute.");

abrogated on other grounds, Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355

(1994).  Pursuant to that Convention, the United States is not permitted to release certain

information it received while participating in foreign investigations.  Stmt. Mat. Facts ¶ 58.

Thus, the NTSB properly invoked Exemption 3 to protect information precluded from release by

the Convention on International Civil Aviation.  Stmt. of Mat. Facts ¶ 58.  See also Indianapolis

Airport Auth., 733 F.2d at 1266 (noting that the Convention has the force of a federal statute).

**C.    The NTSB Properly Invoked Exemption 4**

5 U.S.C. § 552(b)(4) exempts from disclosure "trade secrets and commercial or financial

information obtained from a person and privileged or confidential . . ."  See Public Citizen

Health Research Group v. FDA, 704 F.2d 1280, 1288, 1290 (D.C. Cir. 1983).  To bring a matter

(other than a trade secret) within the orbit of FOIA Exemption 4, it must be shown that the

information is (a) commercial or financial, (b) obtained from a person, and (c) privileged or

confidential.  Nat'l Parks & Conserv. Assoc. v.  Morton, 498 F.2d 765 (D.C. Cir. 1974).

The D.C. Circuit has stated "In our opinion, the term 'trade secrets' in Exemption 4 of

the FOIA should be defined in its narrower common law sense, which incorporates a direct

relationship between the information at issue and the productive process. Accordingly, we define

trade secret, solely for the purpose of FOIA Exemption 4, as a secret, commercially valuable

plan, formula, process, or device that is used for the making, preparing, compounding, or

processing of trade commodities and that can be said to be the end product of either innovation

or substantial effort. This definition, we believe, hews more closely to the language and

legislative intent of the FOIA than does the Restatement approach." Public Citizen Health

Research Group v. Food & Drug Admin., 704 F.2d 1280, 1288-1289 (D.C. Cir. 1983).

Information failing to meet the definition of trade secret, may still be protected by

Exemption 4 if it is commercial or financial information.  Unlike "trade secret," the term

"commercial information" is broad with the words given their ordinary meaning.  Public Citizen

Health Research Group v. Food & Drug Admin., 704 F.2d 1280, 1290 (D.C. Cir. 1983).

11

"Commercial information" includes not only information that reveals basic commercial operations but also information in which the submitter has a "commercial interest."  Id. at 1290.

The relevant question thus becomes whether the information is confidential within the meaning of Exemption 4.  In its en banc decision in Critical Mass Energy Project v. NRC, 975 F.2d 871 (D.C. Cir. 1992), the Court of Appeals for this Circuit established two distinct standards to be used in determining whether commercial or financial information submitted to an agency is "confidential" under Exemption 4.  For information "voluntarily" submitted to the government, a new test was announced in the decision, such information is categorically protected provided it is not "customarily" disclosed to the public by the submitter.  Id.  For information that is "required" to be submitted to the government, the test for confidentiality continues to be the one set forth in National Parks & Conservation Association v. Morton, 498 F.2d 765 (D.C. Cir. 1974).

As explained in the Statement of Material Facts, defendant invoked Exemption 4 to redact and withhold information received voluntarily from two non-governmental sources that those sources would not customarily release to the public.  Stmt. of Mat. Facts ¶¶ 57, 61, 62 & 64.  Prior to withholding the information, the NTSB contacted both entities that voluntarily provided the information.  Stmt. of Mat. Facts ¶ 57.  Each of these entities specifically stated that they would not customarily release the information to the public and that, if such information was released, each entity would be commercially disadvantaged.  Stmt. of Mat. Facts ¶ 57.  Thus, the NTSB properly invoked Exemption 4 to protect third party information voluntarily provided to the NTSB that, the release of which, would commercially harm the source of the information.

12

**D.     The NTSB Properly Invoked Exemption 5**

Title 5, United States Code, § 552 (b)(5) (hereinafter Exemption 5) protects "inter-agency

or intra-agency memorandums or letters which would not be available by law to a party    . . . in

litigation with the agency."  5 U.S.C. § 552(b)(5).  In other words, this exemption protects

documents normally privileged in the civil discovery context.  United States v. Weber Aircraft

Corp., 465 U.S. 792, 799 (1984) ("exemption 5 simply incorporates civil discovery privileges");

FTC v. Grolier Inc., 462 U.S. 19, 26 (1983); NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149

(1975).  This section of the FOIA incorporates, *inter alia*, the attorney-client privilege, the

attorney work-product doctrine, and the executive "deliberative process privilege that protects

candid internal discussions of legal or policy matters."  Maricopa Audubon Soc'y v. United

States Forest Serv., 108 F.3d 1082, 1084 n.1 (9th Cir. 1997).

"The deliberative process privilege, also known as the 'executive' or 'governmental'

privilege serves many purposes."  Eugene Burger Management Corp. v. U.S. Dept. of Housing

and Urban Development, 192 F.R.D. 1, 4 (D.D.C. 1999).  The main purpose of this privilege

"which is well established in the law, is...to 'prevent injury to the quality of agency decisions.'"

Cofield, et al. v. City of LaGrange, Georgia, 913 F. Supp. 608, 615 (D.D.C. 1996) (quoting

NLRB v. Sears Roebuck & Co., 421 U.S. 132, 151 (1975)).  The deliberative process privilege

prevents harm to the quality of agency decisions by shielding the opinions, conclusions, and

reasoning used in the administrative and decision making process of the Government.  See

United States v. Morgan, 313 U.S. 40, 422 (1941); Petroleum Info Corp. v. Dept.  of the Interior,

976 F.2d 1429, 1434 (D.C. Cir. 1992); Access Reports v. Dept. of Justice, 926 F.2d 1192, 1194-

1195 (D.C. Cir.  1991); United States v. Farley, 11 F.3d 1385, 1389 (7th Cir. 1993).

13

The privilege is designed to encourage frank and uninhibited communication among government officials in the course of creating public policy.  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149-151 (1975); Petroleum Info Corp., 976 F.2d at 1434; Access Reports, 926 F.2d at 1194-1195; Farley, 11 F.3d at 1389.  The deliberative process privilege remains even after a final decision has been made, because "disclosure at any time could inhibit the free flow of advice."  Federal Open Market Committee v. Merrill, 443 U.S. 340, 360 (1979).

Since "Exemption 5 'was intended to protect not simply the deliberative material, but also the deliberative process of agencies,'" National Wildlife Federation v. U.S. Forest Service, 861 F.2d 1114, 1118 (9th Cir. 1988) (quoting Montrose Chemical Corp. of California v. Train, 491 F.2d 63, 71 (D.C. Cir. 1974)), the courts have found that even factual materials are encompassed within the privilege, if release of such materials would harm the overall deliberative process.

For a document to be covered by the deliberative process privilege, two requirements must be satisfied.  First, it must be predecisional, i.e., "antecedent to the adoption of agency policy."  Jordan v. U.S. Dept. of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc).  In determining whether a document is predecisional, the Supreme Court has held that an agency need not identify a specific decision in connection with which a document is prepared.  NLRB v. Sears, Roebuck & Co., 421 U.S. at 151 n.18.  The Court recognized that agency deliberations do not always ripen into agency decisions, and that ultimately the privilege is meant to protect the decisional process, rather than any particular document or decision.  Id.; see also Dudman Communications Corp. v. Dept. of the Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987) ("Congress enacted Exemption 5 to protect the executive's deliberative processes -- not to

protect specific materials.").  It is sufficient for the agency to establish "what deliberative

process is involved, and the role played by the documents in issue in the course of that process."

Coastal States Gas Corp. v. Dept. of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980).

     Second, the document must be deliberative in nature, i.e., it must be "a direct part of the

deliberative process in that it makes recommendations or expresses opinions on legal or policy

matters." Vaughn v. Rosen, 523 F.2d 1135, 1143-44 (D.C. Cir. 1975).  Deliberative documents

frequently consist of "advisory opinions, recommendations, and deliberations comprising part of

a process by which governmental decisions and policies are formulated." NLRB v. Sears,

Roebuck & Co., 421 U.S. at 150.  Thus, the exemption covers recommendations, draft

documents, proposals, analyses, suggestions, discussions, and other subjective documents that

reflect the give-and-take of the consultative process. Coastal States, 617 F.2d at 866.

     In addition to invoking Exemption 3 for material provided to the NTSB by foreign

investigators, the NTSB invoked Exemption 5 to protect pre-decisional deliberations.  Stmt. of

Mat. Facts ¶¶ 58, 64.  This is precisely the purpose of Exemption 5; it protects deliberations and

pre-decisional comments prior to the conclusion of the agency.  Thus, the NTSB properly

invoked Exemption 5.

**E.**     **The NTSB Properly Invoked Exemption 6**

     Exemption 6 of the FOIA protects "personnel and medical files and similar files the

disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5

U.S.C. § 552(b)(6).  "The Supreme Court has interpreted the phrase 'similar files' to include ***all***

***information*** that applies to a particular individual." Lepelletier v.  FDIC, 164 F.3d 37, 46 (D.C.

Cir.  1999) (quoting Department of State v. Washington Post Co., 456 U.S. 595, 602 (1982))

(emphasis added).  The Court has also emphasized that "both the common law and the literal

understanding of privacy encompass the individual's control of information concerning his or

her person."  <u>U.S. Department of Justice v. Reporters Committee for Freedom of the Press</u>, 489

U.S. 749, 763 (1989).

      To determine whether there would be a "clearly unwarranted invasion of personal

privacy," the court must balance the interests of protecting "an individual's private affairs from

unnecessary public scrutiny," and "the public's right to governmental information."  <u>Lepelletier</u>,

164 F.3d at 46 (citing <u>United States Dept.  of Defense Dept.  of Military Affairs v.  FLRA</u>, 964

F.2d 26, 29 (D.C. Cir.  1992) and quoting <u>Department of Air Force v.  Rose</u>, 425 U.S. 352, 372

(1976)) (internal quotation marks omitted).  In determining how to balance the private and public

interests involved, the Supreme Court has sharply limited the notion of "public interest" under

the FOIA: "[T]he **only** relevant public interest in the FOIA balancing analysis [is] the extent to

which disclosure of the information sought would 'she[d] light on an agency's performance of its

statutory duties' or otherwise let citizens know 'what their government is up to.'"  <u>Lepelletier</u>,

164 F.3d at 46 (quoting <u>United States Dept.  of Defense v.  FLRA</u>, 510 U.S. 487, 497 (1994))

(emphasis added and internal quotation marks omitted) .  <u>See</u> <u>also</u> <u>Reporters Committee</u>, 489 U.S.

at 773.   Information that does not directly reveal the operation or activities of the federal

government "falls outside the ambit of the public interest that the FOIA was enacted to serve."

<u>Id.</u> at 775.  Further, "something, even a modest privacy interest, outweighs nothing every time."

<u>National Ass'n of Retired Fed.  Employees v.  Horner</u>, 879 F.2d 873, 879 (D.C. Cir. 1989); <u>but

see</u> <u>Lepelletier</u>, 164 F.3d at 48 (in extraordinary circumstance where the individuals whose

16

privacy the government seeks to protect have a "clear interest" in release of the requested

information, the balancing under Exemption 6 must include consideration of that interest).

The NTSB invoked Exemption 6 to withhold the names and contact information for non-

NTSB employees. Such a withholding is proper under Exemption 6. <u>Judicial Watch, Inc. v.</u>

<u>Reno</u>, No. 00-0723 (JR), 2001 WL 1902811, *8 n.3(D.D.C. Mar. 30, 2001) ("The only

remaining redactions are the names of non-government employees, which were properly

withheld under Exemption 6.").

**F.    The NTSB Properly Invoked Exemption 7 and 7(A)**

Application of any of FOIA's exemptions in Exemption 7 requires the agency to satisfy

the threshold issues of, first, whether the agency has the requisite law enforcement purpose in

compiling the records at issue and, second, whether the information gathered has a sufficient

nexus to the law enforcement purpose. <u>See, e.g.</u>, <u>Tax Analysts v. IRS</u>, 294 F.3d 71, 76-79 (D.C.

Cir. 2002); <u>Jefferson v. DOJ</u>, 284 F.3d 172, 176-77 (D.C. Cir. 2002); <u>Campbell v. DOJ</u>, 164

F.3d 20, 32 (D.C. Cir. 1998); <u>Pratt v. Webster</u>, 673 F.2d 408, 419 (D.C. Cir. 1982).

In <u>Jefferson</u>, the court drew a distinction between agencies gathering information as part

of any government agency's "oversight of the performance of duties by its employees," and

information sought as part of investigations into illegal conduct for which the agency might

impose criminal or civil sanctions. 284 F.3d at 177. Thus, the rule from <u>Jefferson</u> provides a

broadly applicable distinction based more on the agency's mission and reasons for collecting the

information at issue.

Many types of agency activities have been upheld as having law enforcement purpose,

even several that arguably go beyond the core law enforcement mission of investigating crimes

that have been committed.  See, e.g., Mittleman v. OPM, 76 F.3d 1240, 1241-43 (D.C. Cir.

1996) (OPM background investigation), cert. denied, 519 U.S. 1123 (1997); Heggestad v. DOJ,

182 F. Supp. 2d 1, 13 (D.D.C. 2000) (Hogan, J.) (IRS has law enforcement purpose); Center to

Prevent Handgun Violence v. Dep't of Treasury, 981 F. Supp. 20 (D.D.C. 1997) (Robertson, J.)

(collecting information on all repeat handgun sales); Doe v. DOJ, 790 F. Supp. 17, 20-21

(D.D.C. 1992) (background investigations).

        In addition, the case law in this circuit is unambiguous that the agency need not tie its

collection of information to any specific or ongoing investigation.  See Tax Analysts, 294 F.3d at

78; Keys 830 F.2d at 342.  This is fully consistent with the courts' broad acceptance that the

1986 amendments to FOIA relaxed the required threshold showing for Exemption 7.  See, e.g.,

United States Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S.

749, 780 (1989) (recognizing that the shift from "would constitute" standard to "could

reasonably be expected to constitute" standard represents a congressional effort to ease

considerably the burden in invoking Exemption 7); S. Rep. No. 221, 98th Cong., 1st Sess. 25

(1983) ("Substitute 'records or information' for 'investigatory records' as the threshold

qualification for the exemption: This amendment would broaden the scope of the exemption to

include 'records or information compiled for law enforcement purposes,' regardless of whether

they may be investigatory or noninvestigatory."); Hopkinson v. Shillinger, 866 F.2d 1185, 1222

n.27 (10th Cir. 1989) ("The 1986 amendment[s] broadened the scope of exemption 7's threshold

requirement.").

        Exemption 7(A) authorizes agencies to withhold "records or information compiled for

law enforcement purposes, but only to the extent that production of such law enforcement

records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552 (b)(7)(A). In defending an Exemption 7(A) withholding, the agency must show that (1) a law enforcement proceeding is pending, or reasonably regarded as prospective, see Manna v. United States Dep't of Justice, 51 F.3d 1158, 1164 (3rd Cir. 1995), or as preventative, see, e.g., Moorefield. v. United States Secret Serv., 611 F.2d 1021, 1026 (5th Cir. 1980), and (2) that the release of the information could reasonably be expected to cause some articulable harm. See Manna, 51 F.3d at 1164. An articulable harm occurs "whenever the government's case in court would be harmed by the premature release of evidence or information," Nat'l Labor Relations Board v. Robbins Tire & Rubber Co., 437 U.S. 214, 232 (1978), or when disclosure would impede any necessary investigation prior to the enforcement proceeding. Dickerson v. U.S. Dep't of Justice, 992 F.2d 1426, 1429 (6th Cir. 1993).

Once the first threshold requirement is satisfied, the agency must establish that the release would result in an articulable harm. To satisfy this burden, the agency must provide at least a general description of the types of documents at issue sufficient to indicate the type of interference threatening the law enforcement proceeding. Curran v. U.S. Dep't of Justice, 813 F.2d 473, 475 (1st Cir. 1987); Spannaus v. U.S. Dep't of Justice, 813 F.2d 1285, 1287 (4th Cir. 1987) (holding that a categorical description of the withheld material is sufficient because any further details "would lead to disclosure of the very information sought to be protected").

As set forth in the Statement of Material Facts, the NTSB properly invoked Exemption 7(A) to withhold information from an ingoing and pending investigation. Specifically, investigation number DFW05MA230 is an ongoing investigation into a September 6, 2005 helicopter crash off the coast of Texas. Stmt. of Mat. Facts ¶ 44. The NTSB is investigating

19

this accident as part of its statutory duties.  Stmt. of Mat. Facts ¶ 1.  As explained in the

Statement of Material Facts, the NTSB does not release materials from ongoing and pending

investigations because doing so would severely impede the progress of that investigation.  Stmt.

of Mat. Facts ¶¶ 46-48.  Moreover, the premature release of information relating to ongoing

investigations would impede and prohibit the NTSB from fulfilling its statutory obligations

relating to aircraft crash investigations.  Id.  Thus, the NTSB has properly invoked Exemption

7(A) to withhold all material relating to the ongoing investigation number DFW05MA230.

**G.     The NTSB Properly Segregated Exempt Information from Non-Exempt**
        **Information**

        The Court of Appeals for the District of Columbia Circuit has held that a District Court

considering a FOIA action has "an affirmative duty to consider the segregability issue sua

sponte."  Trans-Pacific Policing Agreement v. United States Customs Service, 177 F.3d 1022,

1028 (D.C. Cir. 1999).  The FOIA requires that, if a record contains information that is exempt

from disclosure, any "reasonably segregable" information must be disclosed after deletion of the

exempt information unless the non-exempt portions are "inextricably intertwined with exempt

portions."  5 U.S.C. § 552(b); Mead Data Cent., Inc. v. United States Dept. of the Air Force, 566

F.2d 242, 260 (D.C. Cir. 1977).

        In order to demonstrate that all reasonably segregable material has been released, the

agency must provide a "detailed justification" rather than "conclusory statements."  Mead Data,

566 F.2d at 261.  The agency is not, however, required "to provide such a detailed justification"

that the exempt material would effectively be disclosed.  Id.  All that is required is that the

government show "with 'reasonable specificity'" why a document cannot be further segregated.

Armstrong v. Executive Office of the President, 97 F.3d 575, 578-79 (D.C. Cir. 1996).

Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." <u>Mead Data</u>, 566 F.2d at 261, n.55.

The Statement of Material Facts, together with the Declaration of Melba Moye and its exhibits provide the Court with a detailed description of all materials withheld and redacted pursuant to FOIA. They also provide the Court with the information to show that the NTSB properly segregated all exempt materials from non-exempt materials. Thus, the NTSB has properly segregated all documents released and withheld.

<u>CONCLUSION</u>

As set forth herein, the NTSB has properly complied with its FOIA obligations and respectfully requests that the Court grant its motion for summary judgment and enter judgment in its favor.

September 14, 2006                         Respectfully submitted,


                                          _____/s/_____
                                          KENNETH L. WAINSTEIN, D.C.  BAR# 451058
                                          United States Attorney



                                          _____/s/_____
                                          RUDOLPH CONTRERAS, D.C. Bar # 434122
                                          Assistant United States Attorney



                                          _____/s/_____
                                          JOHN F. HENAULT, D.C. Bar # 472590
                                          Assistant United States Attorney
                                          Civil Division
                                          555 4th Street, N.W.
                                          Washington, D.C. 20530
                                          (202) 307-1249
                                          (202) 514-8780 (facsimile)

22