IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BYRON L. PICKARD,<br>  Plaintiff,<br><br>v.<br><br>NATIONAL TRANSPORTATION<br>SAFETY BOARD,<br>  Defendant | 1:06CV01039 (JR) |

## DECLARATION OF THOMAS E. HAUETER

I, Thomas E. Haueter, declare as follows:

1. I am the Deputy Director of the Office of Aviation Safety at the National Transportation Safety Board (NTSB). I have held this position for approximately six (6) years. Prior to assuming my position as the Deputy Director of Aviation Safety at the NTSB, I served as Chief of Major Investigations, investigator-in-charge (IIC), United States accredited representative, or structures investigator for numerous aviation investigations. As such, I have had multiple opportunities to experience the effectiveness of the NTSB's "party process" for several different aviation investigations. I have been on staff at the NTSB since 1983.

2. The statements contained in this declaration are based upon my personal knowledge and experience, as well as information made available to me in my official capacity as an investigator, the Deputy Director of Aviation Safety, and other positions I have held at the NTSB.

## NTSB BACKGROUND AND MISSION

3. Congress established the NTSB in 1967, and in 1974, the NTSB became an independent federal agency with a focused mission. See 49 U.S.C. § 1131. Congress gave the NTSB the authority to investigate every civil aviation accident in the United States and significant accidents in other modes of transportation, which include railroad, highway, marine and pipeline. 49 U.S.C. § 1131(a)(1); 49 C.F.R. § 831.2.

4. At times, the results of the NTSB's investigations may lead to regulatory enforcement actions that other transportation agencies, such as the Federal Aviation Administration (FAA) or the United States Coast Guard, pursue.

5. The NTSB is also responsible for issuing safety recommendations to other transportation agencies intended, in the Board's judgment, to increase safety in transportation and/or prevent future accidents.

## THE NTSB'S PARTY SYSTEM

6. With less than 90 employees available to investigate all civil aviation accidents in the United States, the NTSB accomplishes its task of accident investigation by leveraging its resources. The main way in which the NTSB utilizes its limited resources most effectively and thoroughly is by designating *parties* to its investigations that possess pertinent technical information or abilities that are required to understand the nature of the accident. For example, the NTSB often designates aircraft manufacturers, operators, owners, trade unions, and any person or entity that can provide necessary information as parties to an investigation. Other than the Federal Aviation Administration (FAA), which, under 49 U.S.C. § 1132(c), the NTSB automatically designates as a party to each aviation investigation that the NTSB conducts, the NTSB has complete discretion over which

organizations it designates as parties to each investigation. 49 C.F.R. § 831.11(a). The NTSB only considers organizations or corporations that can provide necessary expertise to an investigation as parties to the investigation. All party members report directly to the NTSB, and each party coordinator signs a party agreement stating that they, their company or organization and their employees assisting in the investigation will comply with the NTSB's governing regulations regarding party participation, available at 49 C.F.R. pt. 831.

7. Given the small size of the NTSB, it is impossible for the NTSB to have expert knowledge of every type of airplane, helicopter, engine, or component; therefore, the NTSB must rely on the voluntary cooperation of parties in providing expert technical and specialized information. The gathering of this information is crucial so that NTSB investigators can utilize the data and information that parties provide in order to analyze the potential cause of each accident. Without the cooperation of such parties in freely providing this information, the NTSB would be unable to fulfill its statutory directive, which is to investigate accidents, determine their likely causes, and issue safety recommendations to prevent future accidents.

8. If the NTSB could not use this party system, or if parties to each investigation did not assist in investigations by providing data and information in an uninhibited manner, then the NTSB almost certainly would not be able to fulfill its statutory mission, which is improving safety by determining the cause of significant transportation accidents. See 49 U.S.C. § 1131(a).

9. In all major NTSB investigations, the NTSB forms groups to examine different aspects of each accident. An investigator-in-charge oversees each group, in which members from the parties offer their specific expertise. Groups that an IIC may organize include a human

factors group, a meteorological group, a survival factors group, a witnesses group, and the like.

10. An NTSB employee serves as the group chairperson for each investigative group. With the help of group members, these chairpersons prepare a factual report, and subsequently ask each party in the group to verify the accuracy of the report. The group chairpersons give the final version of these factual reports to the IIC, who places them in the "public docket" of information for the investigation. In general, the public docket is available upon the conclusion of each investigation, and contains all factual investigative information that was pertinent to the investigation. Personal information, sensitive information, and proprietary information are normally not placed in the public docket.

## IMPORTANCE OF NOT RELEASING INVESTIGATIVE INFORMATION BEFORE THE CONCLUSION OF AN INVESTIGATION

11. The NTSB does not release information or records regarding ongoing analysis of an investigation that is pending. Prior to the close of an investigation, the NTSB may release factual information in the form factual reports, preliminary reports or press releases. The information in these initial records is limited to factual information.

12. The release of records from the analysis of a pending investigation would severely impede the progress of that investigation, in a variety of ways. Analytical records from pending investigations may consist of notes that include deliberations and ideas that result from brainstorming. Releasing such records would significantly chill the deliberations of the NTSB and parties who are participating in the investigation.

13. Releasing analytical records before an investigation is complete would affect the progress of the investigation, because requesters receiving the records would likely misunderstand the

records, as well as the NTSB's and parties' deliberations, and consequently speculate on the importance of certain aspects of the accident. Such public speculation would cause confusion and distract the NTSB and participating parties, thereby significantly slowing the progress of the investigation.

14. The NTSB's statutory mandate is to find the causes of transportation accidents and propose recommendations for improving transportation safety. Releasing analytical records from pending investigations would prohibit the NTSB from fulfilling these statutory objectives.

15. Overall, release of analytical information from a pending investigation in response to a FOIA request would significantly inhibit the NTSB's fulfillment of its statutory mission.

## IMPORTANCE OF PARTY COOPERATION REGARDING SHARING OF NECESSARY INFORMATION

16. When the NTSB designates organizations and corporations, such as manufacturers, as parties to an investigation, the NTSB relies on the uninhibited cooperation from each party. It is absolutely necessary to the NTSB's mission to receive open, uninhibited correspondence, ideas, and information from parties. More often than not, parties provide technical expertise to certain aspects of the investigation that is critical to the NTSB's investigation of the cause of an accident.

17. The NTSB frequently deals with the same parties repeatedly. Most of the time, NTSB investigators personally know participants in each investigation, and have previously worked with these participants. Such parties understand the NTSB's investigative process and submit information to the NTSB in a voluntary fashion. In general, parties trust the NTSB not to disseminate sensitive or proprietary information.

18. Without parties' trust of the NTSB not to release commercially sensitive or proprietary information, parties would not be inclined to provide the NTSB with necessary information related to their product or component in a voluntary manner.

19. If the NTSB could not obtain information from parties voluntarily, then the NTSB would need to utilize attorneys in the NTSB's Office of General Counsel to obtain the information. Using attorneys in each investigation to obtain information would significantly impede the progress of each investigation.

20. Overall, if the NTSB could not easily obtain commercially valuable information from parties because the parties would be concerned that the NTSB would release it to the public, then the NTSB would not be able to fulfill its statutory purpose.

21. In addition, if the NTSB could not obtain information from parties because the NTSB released the information while the investigation was still ongoing, then parties would not be inclined to participate freely in NTSB investigations.

22. As explained above, the NTSB relies heavily on utilizing the party process for transportation investigations. Any threat to the integrity and effectiveness of this party process would cause the NTSB to circumvent its statutory mission of finding the causes of transportation accidents.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this ___14th___ day of September, 2006, in Washington, D.C.

_____
Thomas E. Haueter
Deputy Director, Office of Aviation Safety

6